810 So.2d 1214 (2002)
STATE of Louisiana, Appellee,
v.
Quincy LOYD, Appellant.
No. 35,637-KA.
Court of Appeal of Louisiana, Second Circuit.
February 27, 2002.
*1216 Peggy J. Sullivan, Louisiana Appellate Project, Monroe, for Appellant.
*1217 Richard Ieyoub, Attorney General, Robert W. Levy, District Attorney, John Lane Sheehan, Assistant District Attorney, for Appellee.
Before BROWN, GASKINS and KOSTELKA, JJ.
BROWN, J.
A unanimous jury convicted defendant, Quincy Loyd, of attempted armed robbery and aggravated burglary. After being adjudicated a second felony offender, defendant was sentenced to 45 years at hard labor without benefit of probation, parole or suspension of sentence for the attempted armed robbery conviction and 25 years at hard labor without benefit of probation, parole or suspension of sentence for the aggravated burglary conviction, the latter sentence to run concurrently with the sentence imposed for attempted armed robbery. Defendant now appeals his convictions and sentences. We affirm, but amend the sentence for aggravated burglary, to delete that portion of the sentence denying defendant the benefit of parole.

Facts
Around midnight on the evening of September 8, 1999, members of the Steve Goldsby family were asleep in their home in Farmerville, Louisiana, when they were awakened by intruders. Steve Goldsby, his wife, Darlene, and his daughter, Athena, were asleep in one bedroom, and Darlene's brother, Willie Heard, was asleep in another bedroom. Darlene testified that she had heard the bedroom door being pushed open. The bedroom was dark, the only light coming from the hallway through the opened door. She saw four people standing in the doorway but could not see their faces. One of the men fired several shots toward the bed. One shot struck Darlene in her face and another hit Athena in her side.
Steve rolled out of bed, pulling Darlene to the floor with him. Steve told Athena to get up, but she was unable to move. Steve did not recognize the male intruder who commanded, "Come on out! I know you're over there. Come on out, come out. I got this nine. I got this nine." The intruder warned the Goldsbys not to try anything funny. Darlene recognized the voice of the gunman as that of Deltra Henderson, whom she had known since childhood.
Steve put a clip in the .45 caliber pistol he kept under the bed and fired it out of his bedroom window to get Luther Heard's attention. Luther was Steve's other brother-in-law who lived in a mobile home behind the Goldsbys' home. The intruders left. As a result of the gunshots, Darlene's face is permanently disfigured and Athena is paralyzed from the waist down.
Defendant was subsequently arrested and charged with aggravated burglary and attempted armed robbery. Although the victims were unable to identify defendant as one of the perpetrators of the crimes, a jury found defendant guilty on both charges based upon his confession to Detective Trey Fulton, which the defense unsuccessfully sought to suppress, and corroborating and circumstantial evidence provided by the testimony of Robert Loyd, defendant's first cousin.
Robert Loyd testified that on the evening of September 8, 1999, he was with Deltra Henderson outside of the Eastside Apartments in Farmerville when a red Tempo arrived. Aaron Green, Germaine Middletown, and defendant were in the car. Deltra spoke with the occupants and returned to tell Robert that Aaron Green was talking about robbing Steve Goldsby. The red Tempo then left.
Later that evening at about 11:00 or 11:30, Robert and Deltra again encountered the three men in the Tempo in Farmerville; the trio parked their vehicle at a residence and joined Robert and Deltra *1218 in Deltra's car. Deltra drove and parked at his former residence located about two blocks from the Goldsby home. Aaron related that the group was going to rob Goldsby and asked Robert whether he was going with them. Defendant was armed with a shotgun, and Deltra and Aaron had nine millimeter pistols. Germaine was unarmed. At that time Robert decided not to participate. Germaine, Aaron, Deltra and defendant left the parked car and walked in the direction of the Goldsby home.
Robert waited by Deltra's car for a total of 20 or 30 minutes. He heard several gunshots, and about 10 minutes later, defendant, Aaron and Germaine returned to Deltra's car. Defendant and Aaron were still carrying their guns. Deltra did not return. Robert drove defendant, Aaron and Germaine in Deltra's car back to the Tempo. Robert drove Deltra's car to a girlfriend's apartment. Robert did not see Deltra again until early the next morning.
Robert Loyd's testimony corroborated statements made by defendant, who was arrested in Monroe on September 14, 1999 in connection with the instant crimes.
Defendant told Detective Trey Fulton of the Union Parish Sheriff's Office that on the night of the crimes, he, Germaine and Aaron traveled from Monroe to Farmerville in a red car to meet Deltra and Robert. They planned to go to Steve Goldsby's home to rob Goldsby of money. After joining Robert and Deltra, they rode to Deltra's old house, parked the car, and defendant, Deltra, Aaron and Germaine began to walk toward the Goldsby home to commit the robbery. Robert decided to stay by the car.
Defendant said he climbed into the Goldsby home through a window in Willie Heard's bedroom and then opened the front door for the rest of the men. While Deltra and Germaine went back to Steve Goldsby's bedroom, defendant stayed midway down the hall, holding a shotgun, and Aaron stood at the front door. After hearing a barrage of gunfire, defendant left the house without firing the shotgun he carried. Defendant, Aaron and Germaine returned to the car, but Deltra did not. Then Robert drove defendant, Aaron and Germaine back to the red car, and they went back to Monroe. Defendant discarded the shotgun in a trash dumpster in Monroe. The shotgun was never recovered. At trial, Detective Fulton made an in-court identification of defendant as the person who gave the statement on September 15.
A jury of 12 convicted defendant as charged. His oral motion for post-verdict judgment of acquittal was denied by the trial court. Defendant waived sentencing delays. The court sentenced defendant to imprisonment at hard labor for 45 years without benefit of probation, parole or suspension of sentence for attempted armed robbery and 25 years imprisonment at hard labor for the aggravated burglary conviction, to run concurrently with the sentence imposed for attempted armed robbery. Defendant made an oral motion to reconsider sentence, which was denied.
Thereafter, the state filed a multiple offender bill, charging defendant as a second felony offender under La.R.S. 15:529.1. Defendant pled guilty to being a second felony offender, and the court sentenced him to the same sentence, without vacating the previously imposed sentence. Because of confusion regarding defendant's sentences, a new sentencing proceeding was conducted on June 19, 2001. Defendant's sentences were vacated, and he was sentenced as a second felony offender to the same sentences as per agreement of the parties. However, the trial court ordered that the 25-year sentence for aggravated burglary be served without benefit of probation, parole or suspension *1219 of sentence. Defendant's previous post-trial motions were reurged and denied. This appeal followed.

Discussion

Sufficiency of Evidence
While defendant admits in brief that the trial testimony was sufficient to support a conviction of aggravated burglary, he argues that the state offered no evidence, direct or circumstantial, that the he or the other offenders had the specific intent to commit an armed robbery. Specifically, defendant claims that the state failed to prove that defendant had the specific intent to take something of value from the person of another or in the immediate control of another. He contends that this was a bungled burglary, and the only evidence of an intent to rob was the testimony of Robert Loyd. Defendant also argues that the victims were asleep and would not be expected to have anything of value on their persons.
Specific intent to commit a crime is an element of an attempted offense. La.R.S. 14:27. Hence, a conviction of an attempted offense must rest upon sufficient proof that the offender actively desired to cause the proscribed criminal consequences to follow his act or failure to act and that the offender committed or omitted an act for the purpose and tending directly toward the accomplishing of his object. La.R.S. 14:10, 14:27. See State v. Parish, 405 So.2d 1080 (La.1981), after remand, 429 So.2d 442 (La.1983).
Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.1982). The determination of whether the requisite intent is present in a criminal case is for the trier of fact. See State v. Huizar, 414 So.2d 741 (La.1982); State v. Butler, 322 So.2d 189 (La.1975). In reviewing the correctness of such determination, the court should review the evidence in a light most favorable to the prosecution and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of defendant beyond a reasonable doubt as to every element of the offense. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Huizar, supra.
The court in State v. Doan, 519 So.2d 174, 176 (La.App. 4th Cir.1987), writ denied, 532 So.2d 145 (La.1988), set forth the law pertaining to things taken from the immediate control of a person as follows:
The requirement that there be property taken `from the person of another' has been broadened to include taking `in the presence of the person.' The felonious taking, more than the perfect title of the alleged owner, is the essence of the jury question in robbery cases. State v. Refuge, 300 So.2d 489 (La.1974). See also State v. McClanahan, 262 La. 138, 262 So.2d 499 (1972); State v. Sanford, 446 So.2d 1381 (La.App. 1st Cir.1984). It is sufficient if the property is under the person's control so that, had the victim not been subjected to violence or intimidation by the robber, he could have prevented the taking. State v. Mason, 403 So.2d 701 (La.1981). Property is considered taken from the presence of the victim even if the victim is in one room while valuables located in another room are removed. State v. Verret, 174 La. 1059, 142 So. 688 (1932). See also State v. Baldwin, 388 So.2d 664 (La.1980), cert. denied, 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830 (1981). In State v. Jacobs, 493 So.2d 766 (La.App. 2d Cir.1986), evidence that one of the robbers took the victim's wallet from his pants on a chair in an adjoining room while the victim was awakened in his bedroom, struck on the head *1220 and stumbled onto the floor of that room was found sufficient to support an armed robbery conviction. (Emphasis added).
Defendant admitted to Detective Fulton that he and the others planned to steal money from Goldsby. Once inside the house, defendant, armed with a loaded shotgun, and his cohorts, armed with nine millimeter pistols, attempted to kill or harm the Goldsbys by firing shots into the bedroom and then ordering them to come out of the room. Viewing the evidence in this case in a light most favorable to the state, a rational trier of fact could infer that defendant and his accomplices had the specific intent to take something of value from the victims or in their control.

Motion to Suppress Statement
At a hearing on a motion to suppress a confession, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Roddy (La.App.2d Cir.04/07/00), 756 So.2d 1272, writ denied, XXXX-XXXX (La.05/11/01), 791 So.2d 1288; State v. Rogers, 476 So.2d 942 (La.App. 2d Cir.1985). A trial court's findings concerning whether the statement was free and voluntary are entitled to great weight and will not be disturbed unless unsupported by the evidence. State v. Durr, 28,197 (La.App.2d Cir.06/26/96), 677 So.2d 596; State v. English, 582 So.2d 1358 (La. App. 2d Cir.1991), writ denied, 584 So.2d 1172 (La.1991).
The trial court denied defendant's motion to suppress any statements and/or confessions after a hearing on the motion was held on February 26, 2001. At the hearing, Detective Fulton testified that he first interviewed defendant on September 14, 1999, after defendant was arrested in connection with the instant crimes by the Monroe Police Department. The interview was conducted at the Monroe City Jail. Det. Fulton began the interview with defendant by verbally advising him of his Miranda rights. Defendant asked Fulton if he could talk about it without incriminating himself. Det. Fulton told defendant that he didn't think that was possible. Defendant then said that he would talk to a lawyer or a family member in the morning and he would give Det. Fulton a call. Defendant told Det. Fulton that he wanted to make some kind of deal with the D.A.'s office, and Det. Fulton replied that he couldn't make deals. Det. Fulton gave defendant a phone number where he could be reached and left.
Det. Fulton further testified that on the next day, September 15th, he was contacted by phone by Larry Manning, who said that he was defendant's uncle. Manning told Det. Fulton, "I've talked to Quincy today. Quincy wants to talk to you." Defendant's September 15th interview was conducted in the detective's interview room of the Union Parish Sheriff's Office. Det. Fulton began the interview by verbally advising defendant of his Miranda rights. Det. Fulton also went over the explanation of rights form with the defendant. As Det. Fulton explained each right, defendant checked "yes" on the form, indicating that he understood and waived that right. Defendant also verbally stated that he understood and waived these rights and signed the form to signify the same. Det. Fulton stated that he did not threaten defendant, nor did he make any promises, pleas or deals with the defendant. Det. Fulton also related that no duress or intimidation was used, nor was water, food or medication withheld to induce defendant into giving a statement.
Det. Fulton informed defendant that his uncle had contacted the officer and indicated that defendant wanted to talk. Defendant confirmed that he had talked to his uncle. Det. Fulton stated that he asked *1221 defendant to tell him what happened, and then Det. Fulton asked defendant some questions. Officer J.D. Simpson was present during the entire interview, which lasted approximately 30 to 60 minutes.
On redirect examination, Det. Fulton stated that on September 14th, defendant never told him that he wanted a lawyer, nor did he ask the officer to get him a lawyer. Also, defendant never indicated to Det. Fulton that he would not talk to him unless he had a lawyer. On September 15th, defendant indicated that he was willing and ready to talk to Det. Fulton. Defendant never indicated at any time on September 15th that he wanted a lawyer before or during the interview with Det. Fulton.
The trial court concluded that defendant never invoked his right to be represented by counsel. The trial court determined that on September 14th, defendant simply expressed his desire to give further consideration to giving up his right to counsel before making a statement. The trial court found that defendant was fully advised of all of his rights before giving the statement, and that the statement was free and voluntary.
In State v. Hobley, 98-2460 (La.12/15/99), 752 So.2d 771, cert. denied, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000), the Louisiana Supreme Court summarized the applicable law as follows:
Before introducing a confession into evidence, the state must establish that the accused was advised of his constitutional rights under Article 1, Section 13 of the Louisiana Constitution and the Supreme Court's decision in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). State v. Simmons, 443 So.2d 512 (La.1983). In Miranda, the U.S. Supreme Court recognized the coercive atmosphere created by police custody and established a procedural mechanism to safeguard the exercise of a defendant's Fifth Amendment rights. Before interrogating a suspect in custody, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney, and that if he cannot afford an attorney, one will be appointed for him.
In addition, once a suspect in custody expresses a desire, at any stage in the process, to deal with the police only through counsel, all questioning must cease, and the accused may not be subject to further interrogation until counsel has been made available to him, unless he initiates further communication, exchanges or conversation with the police and validly waives his earlier request for counsel. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981); Miranda, 384 U.S. at 444-45, 86 S.Ct. at 1612. Miranda and Edwards are prophylactic rules designed to protect an accused against the inherently compelling pressures of custodial interrogation, whether by police badgering, overreaching or subtle but repeated efforts to wear down an accused's resistance and make him change his mind. Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983). Minnick v. Mississippi, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), reaffirmed Edwards, stating that "when counsel is requested, interrogation must cease; and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." Id. at 153, 111 S.Ct. at 491.
Louisiana adheres to these same principles. When an accused invokes his right to counsel, the admissibility of a subsequent confession or incriminating statement is determined by a two-step inquiry: 1) did the accused initiate further *1222 conversation or communication; and 2) was the purported waiver of counsel knowing and intelligent under the totality of the circumstances. State v. Abadie, 612 So.2d 1, 5 (La.1993). Thus, the questions presented in this case are whether defendant invoked his right to counsel, and, if so, did he initiate further contact with the police and did he knowingly and intelligently waive his right to counsel.
Our review of the record of the hearing on defendant's motion to suppress reveals that the trial court did not err in denying that motion. The testimony of Detective Fulton supports the trial court's finding that defendant did not invoke his right to counsel and, even if he did, that defendant initiated the further contact with Det. Fulton. The record further supports the trial court's finding that the state met its burden of proving that defendant was fully and completely advised of his Miranda rights, waived those rights, and gave the subsequent statement freely and voluntarily. The trial court's findings are entitled to great weight and will not be disturbed. See State v. Durr, supra; State v. English, supra. This assignment is therefore without merit.

Challenge for Cause
Juror Jerry Smith was in the first panel of prospective jurors examined by the court and by the attorneys. Smith indicated that he knew Sheriff Bob Buckley and a number of the Union Parish Sheriff's deputies.[1] The trial court determined that none of the deputies that Smith knew would be called as witnesses by the state. When asked if he knew Deputy Fulton, who would be called as a witness in this case, Smith said that he "knew of" Fulton and knew his wife, but didn't know the detective personally.
Smith asserted that he had not acquired any information concerning the instant case from any of his associations. He repeatedly asserted that he would be fair and impartial. Smith's final statement to the court was, "It won't affect my decision in any way."
During voir dire, Smith was challenged for cause by defendant. The trial court denied that challenge. At the conclusion of jury selection, defendant exhausted all 12 of his peremptory exceptions.
Challenges for cause are regulated by La.C.Cr.P. art. 797, which provides in pertinent part:
The state or defendant may challenge a juror for cause on the ground that:
* * *
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
* * *
In State v. Coleman, 32,906 (La.App.2d Cir.04/05/00), 756 So.2d 1218, writ denied, 2000-K-1572 (La.03/23/01), 787 So.2d 1010, a panel from this court summarized the law applicable to a juror's challenge for cause because of association with a law enforcement officer:
The trial judge is vested with broad discretion in ruling on challenges for *1223 cause; his ruling will be reversed only when a review of the entire voir dire reveals an abuse of discretion. State v. Butler, 30,798 (La.App.2d Cir.06/24/98), 714 So.2d 877, writ denied, 98-2217 (La.01/08/99), 734 So.2d 1222, citing State v. Cross, 93-1189 (La.06/30/95), 658 So.2d 683. When a defendant has exhausted all his peremptory challenges during jury selection, prejudice will be presumed if the trial court has erroneously denied a challenge for cause. State v. Butler, supra; State v. Divers, 94-0756 (La.09/05/96), 681 So.2d 320. An erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. State v. Divers, supra. To obtain a reversal of his conviction and sentence, therefore, a defendant must show that: (1) the trial court erroneously denied a challenge for cause; and (2) he used all of his peremptory challenges. State v. Divers, supra. Counsel should be permitted wide latitude in questioning prospective jurors during voir dire and the scope of the examination shall be within the sound discretion of the trial court. La. Const. art. 1, § 17; La.C.Cr.P. art. 786; State v. Allen, 380 So.2d 28 (La.1980). Even where a prospective juror's affiliations raise an issue regarding his ability to be impartial, if, after voir dire examination, the trial judge is satisfied that the prospective juror can render an impartial verdict according to the law and the evidence, it is the trial judge's duty to deny defendant's challenge for cause. La.C.Cr.P. art. 797(2); State v. Timon, 28,747 (La.App.2d Cir.10/30/96), 683 So.2d 315, writ denied, 96-2880 (La.04/25/97), 692 So.2d 1081.
A juror's association with law enforcement agencies or personnel will not alone disqualify him from service. State v. Butler, supra. Such an association, however, should be closely scrutinized by the trial court and the appellate court. Id. People with prior law enforcement connections are competent to serve on a criminal jury. Id., citing State v. Henderson, 566 So.2d 1098 (La. App. 2d Cir.1990); C.F. State v. Brown, 97-1531 (La.App. 3rd Cir.06/10/98), 715 So.2d 566, writ denied, 98-1790 (La.09/23/98), 724 So.2d 773. Additionally, the fact that a prospective juror is "friends" with, or related to, law enforcement officials or the district attorney is not grounds for automatic exclusion for cause. State v. Connolly, 96-1680 (La.07/01/97), 700 So.2d 810; State v. Lee, 559 So.2d 1310 (La.1990); State v. Butler, supra; State v. Henderson, supra. When a juror has a prior or current association with law enforcement officials, the question becomes whether the juror can assess the credibility of the witnesses independent of the association. State v. Butler, supra. The trial court should examine "whether the prospective juror's position might have produced relationships or attitudes that would disqualify him as a juror." Id. The basis for disqualification should be covered during voir dire and appear in the record. Id.[2]
Although defendant has shown that he used all of his peremptory challenges, he has failed to prove that the trial court erroneously denied a challenge for cause. See State v. Divers, supra. None of the responses provided by Smith were such that one could reasonably imply bias or *1224 prejudice on his part against defendant. He stated that he could be a fair juror despite his acquaintances with law enforcement officials. None of Smith's answers during voir dire warranted a challenge for cause under La.C.Cr.P. art. 797. Thus, the trial court did not commit reversible error in failing to grant defendant's challenge for cause as to Smith.
This assignment of error is also without merit.

Excessive Sentence and Motion to Reconsider
In these two assignments of error argued together, defendant contends that the sentence imposed is too harsh and that the court erred in denying a motion to reconsider the sentence. He notes that maximum sentences are reserved for the worst of offenders, and asserts that his sentences were near the maximum. Defendant contends that he was not the worst of offenders because he did not fire a weapon or cause injury. He argues that his sentences left very little room for differentiation between him and the person who actually fired the shots. Defendant further notes as mitigation that his prior conviction was not a crime of violence and that he was working to improve himself by obtaining a CDL license. He also contends that nothing in his background and personal life justifies the sentences imposed.
The penalty for a conviction of attempted armed robbery is not less than five and not more than 49½ years at hard labor, without benefit of parole, probation or suspension of sentence. La.R.S. 14:64 and 14:27. The penalty for an aggravated burglary conviction is imprisonment at hard labor for not less than one nor more than 30 years. La.R.S. 14:60.
Under La.R.S. 15:529.1A(1)(a), as a second felony offender, defendant faced a possible sentence of imprisonment at hard labor of not less than 24 ¾ years and not more than 99 years, without benefit of parole, probation or suspension of sentence, for the crime of attempted armed robbery. For his aggravated burglary conviction, defendant faced a possible hard labor sentence of imprisonment of not less than 15 years and not more than 60 years. La.R.S. 15:529.1G requires that any sentence imposed under the provisions of that section be without benefit of probation or suspension of sentence. It does not say without benefit of parole. Defendant's sentence of 45 years at hard labor for attempted armed robbery, and 25 years imprisonment at hard labor for the aggravated burglary conviction are both less than half the maximum sentences possible.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La.C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App.2d Cir.06/24/98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which should be considered are defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La. 1981); State v. Bradford, 29,519 (La. *1225 App.2d Cir.04/02/97), 691 So.2d 864; State v. Hudgins, 519 So.2d 400 (La.App. 2d Cir.), writ denied, 521 So.2d 1143 (1988). There is no requirement that specific matters be given any particular weight at sentencing. State v. Jones, 33,111 (La.App.2d Cir.03/01/00), 754 So.2d 392, writ denied, XXXX-XXXX (La.02/02/01), 783 So.2d 385; State v. Callahan, 29,351 (La.App.2d Cir.02/26/97), 690 So.2d 864, writ denied, 97-0705 (La.09/26/97), 701 So.2d 979.
The record adequately indicates the trial court was aware of the matters urged by the defense prior to imposing sentence. The trial court considered as a mitigating factor the fact that defendant did not fire a weapon, nor did he cause any injury. The record also reflects that the trial court was aware that defendant was working to improve himself by obtaining a CDL license and was employed prior to his incarceration. Although the record does not reflect that the trial court specifically articulated that the prior crime was not a crime of violence as a mitigating factor, the record clearly shows an adequate factual basis for the sentence imposed. See State v. Lanclos, supra. There is no requirement that specific matters be given any particular weight at sentencing. State v. Jones, 754 So.2d at 394; State v. Callahan, supra. Important elements of defendant's personal history (including his age and family ties), prior criminal record, seriousness of offense and the likelihood of rehabilitation were considered. State v. Jones, 398 So.2d at 1051; State v. Bradford, supra; State v. Hudgins, supra.
Whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, supra. Absent a showing of manifest abuse of that discretion a reviewing court may not set aside a sentence. State v. Guzman, 99-1528, 99-1753 (La.05/16/00), 769 So.2d 1158.
Contrary to defendant's assertion, he did not receive near maximum sentences. In fact, defendant's sentences of 45 years at hard labor for attempted armed robbery and 25 years imprisonment at hard labor for the aggravated burglary conviction are both less than half the maximum sentences possible for a second felony offender under La.R.S. 15:529.1A(1)(a). These sentences are not grossly disproportionate. When the crimes and punishments are viewed in light of the harm done to society, including the severity and permanency of the damages caused to the victims, they do not shock the sense of justice. State v. Hogan, supra; State v. Bradford, supra. Thus, finding no showing of manifest abuse of that discretion, this court will not set aside the sentences. State v. Guzman, supra.

Error Patent
La.R.S. 15:529.1G provides that a sentence imposed under the habitual offender statute is to be served without benefit of probation or suspension of sentence. However, that statute does not require that the sentence be served without benefit of parole. State v. Tate, 99-1483 (La.11/24/99), 747 So.2d 519. Unlike attempted armed robbery, aggravated burglary does not statutorily provide for the imposition of a sentence without benefit of parole. State v. Russell, 32,094 (La. App.2d Cir.06/16/99), 742 So.2d 910. Since its deletion does not involve the exercise of *1226 judicial discretion, we amend the sentence for the aggravated burglary conviction to delete that portion denying the benefit of parole. State v. Tate, supra.

Conclusion
For the foregoing reasons, we affirm the conviction and sentence for attempted armed robbery. The sentence for aggravated burglary is amended to delete the portion of the sentence denying the benefit of parole, and defendant's conviction and sentence are affirmed as amended.
AMENDED and AS AMENDED, AFFIRMED.
NOTES
[1] The deputies Smith knew included Peyton McKinnie, "the Halley boy," and Huey Rhodes. Smith stated that he worked with Sheriff Bob Buckley's father at IMC Chemical Plant, and had family and personal ties to Sheriff Buckley. Smith also said that he socialized with McKinnie. Smith stated that he saw McKinnie every two weeks or so while "hunting and stuff," but that they do not visit each other's houses. However, Smith indicated that McKinnie occasionally dropped by the house while on patrol "just to talk".
[2] State v. Brown, 97-1531 (La.App. 3rd Cir.06/10/98), 715 So.2d 566, writ denied, 98-1790 (La.09/23/98), 724 So.2d 773, was recognized as overruled in State v. LaCaze, 99-728 (La.App. 3d Cir.12/08/99), 759 So.2d 773. However, it is cited as historical reference, and not relied upon, in State v. Coleman, supra.